**Exhibit B**

**Endorsement of Canadian Court**



# SUPERIOR COURT OF JUSTICE
# COMMERCIAL LIST

## COUNSEL SLIP / ENDORSEMENT

**COURT FILE NO.:**   CL-26-00000182-0000        **DATE:**    MAY 15, 2026

**REGISTRAR:** ASHAAD KAZIM

**NO. ON LIST:**    4

**TITLE OF PROCEEDING: ROYAL BANK OF CANADA v. LION FORCE TRANSPORT INC. et al**

**BEFORE: JUSTICE FL MYERS**

| PARTICIPANT INFORMATION |
|---|

### For Plaintiff, Applicant / Moving Party:

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Steven Graff<br>Cristian Delfino<br>Samantha Hans | Lawyers for the Applicant, Royal Bank of Canada | sgraff@airdberlis.com<br>cdelfino@airdberlis.com<br>shans@airdberlis.com |

### For Defendant, Respondent, Responding Party, Defence:

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| David Ward<br>Monica Faheim<br>Armando Ranjbar<br>Steven Weisz | Lawyers for the Respondents,<br>Lion Force Transport Inc.,<br>2696942 Ontario Inc., and<br>2854233 Ontario Inc. | dward@millerthomson.com<br>mfaheim@millerthomson.com<br>aranjbar@millerthomson.com<br>sweisz@cozen.com |

1

**For Other, Self-Represented:**

| Name of Person Appearing | Name of Party | Contact Info |
|---|---|---|
| Roger Jaipargas | Lawyer for the Proposed Receiver, Fuller Landau Group | rjaipargas@blg.com |
| John Birch | Lawyer for the Proposed Monitor, TDB Restructuring Limited | jbirch@cassels.com |
| Timothy Dunn | Lawyer for the Creditor, TD Equipment Finance | tdunn@blaney.com |
| Chris Burr | Lawyer for the Creditor, Ten Leasing | chris.burr@blakes.com |

**ENDORSEMENT OF JUSTICE FL MYERS:**

1. This endorsement applies as well to the application by Lion Force Transport Inc. and several affiliates for relief under the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36 under Court File No:CL-26-212. It should be uploaded to both files in the court's data management system.

2. Lion Force and its affiliates operate a trucking and logistics company. The head office is in Brampton. But it operates as well in the US through a US affiliate and in Mexico. It has employees in India running a help desk.

3. Royal Bank of Canada is the principal creditor of Lion Force.

4. Lion Force owes the bank around $53 million. The bulk of the debt is secured by a mortgage on the head office in Brampton. The rest relates to various operating facilities and is secured by a full security package including personal guarantees.

5. Lion Force went into default on its indebtedness to Royal Bank in 2024. It acknowledged its indebtedness and defaults in a series of forbearance agreements with the bank.

6. The first forbearance agreement between the parties was dated February 6, 2025.

2

7. The most recent forbearance agreement was scheduled to expire on March 31 of this year. But on March 2, 2026, Royal Bank became aware that Lion Force had run up previously undisclosed arrears of property tax with the municipality of more than $500,000. As property taxes have first priority on a sale of land, the property tax arrears erode the value of the bank's security.

8. Accordingly, the bank demanded payment on its loan on March 3, 2026. It served the 10-day notice required under s. 244 of the *Bankruptcy and Insolvency Act* at that time as well.

9. Subsequently, the bank learned that Workers Safety & Insurance Board issued a garnishment from the court requiring Lion Force to pay over $600,000. It also learned that Lion Force's insurance was cancelled by EDC. At least some insurance has subsequently been put in place by Lion Force.

10. Royal Bank also learned from Lion Force that it is in arrears to its truck drivers, carriers, and its fuel suppliers. Lion Force fears that truckers and carriers will seize their loads and require Lion Force's shipper customers to pay the truckers directly. This will erode Lion Force's accounts receivable that are the principal collateral supporting the bank's operating line.

11. On April 28, 2026 Royal Bank issued the Notice of Application in this proceeding seeking the appointment of The Fuller Landau Group Inc. as receiver of Lion Force and two of its affiliates.

12. The Respondent 2696942 Ontario Inc. owns the Brampton head office property.

13. On its face, the receivership application is not unusual. The bank debt and defaults are not in doubt. Lion Force remains in operation while failing to pay creditors and accruing arrears to numerous parties.

14. Lion Force admits its insolvency in its CCAA application discussed below.

15. The bank asks for a receiver because the trucks and trailers are spread out in the US and principally, it seems, in Mexico. Collecting them will require time and funding. Moreover, there are numerous creditors with claims of different priorities against different assets. Disputes are bound to occur. A Receiver, supported by a

court-ordered stay of enforcement by creditors, ensures that there is a fair process for all interested parties and that no one can try to use leverage to interfere with the collection and liquidation of assets to be paid to creditors once priorities are fully determined by settlements or by the court.

16. In addition, Lion Force has received an expression of interest for its head office land. It is an opening nudge rather than a final bid after proper due diligence by a proposed buyer. But the proposed price would likely leave Royal Bank underwater on its recovery. The only people who will recovery anything in that circumstance are people whose claims against particular pieces of property hold priority over the bank's security. It also means that granting priority charges to creditors who do not currently have secured claims ahead of the bank, are paid for by the bank from its recovery. Every dollar that is put above it in priority erodes its recovery.

17. One purpose of appointing a court officer as a neutral steward of debtor's assets is to avoid a race to the swiftest where possession becomes 9/10ths of the law and determination and enforcement of lawful priorities becomes much more difficult.

18. Unfortunately, there is already a race of creditors to reclaim assets under way. Ten Leasing says it owns 158 vehicles leased to Lion Force. It already has bailiffs out trying to repossess their vehicles.

19. Just yesterday, TD Equipment Finance obtained an order from Dirkstein J. confirming that the lessor had terminated its leases and is entitled to possession of its vehicles. Although once the leases had been terminated Lion Force had no ongoing right to hold or use the TD Equipment Finance vehicles, Lion Force had been unwilling to provide TD Equipment Finance with the location of its vehicles. The judge ordered Lion Force to provide the GPS coordinates of the vehicles to the lessor/owner. The vehicles are apparently in Mexico.

20. No matter what the outcome today, Lion Force has no right to possess leased vehicles if the leases have been terminated validly prior to the commencement of proceedings. Whether a stay issues today under the *CCAA* or in a receivership,

possession of some collateral has been won by the swiftest already. How priorities battles get raised or play out in those cases is not a today issue.

21. Subject to the consideration of Lion Force's *CCAA* application, there is no doubt that it is just and convenient to appoint a receiver over the property of the debtors in this receivership proceeding. Royal Bank has acknowledged security that includes a right to appoint a receiver. It is very possible that the bank will suffer a shortfall on its recovery. The assets are complex and the likelihood of numerous competing claims being brought against different pieces of property makes patent the desirability of appointing a neutral, experienced licensed insolvency professional to guide all stages of the process as the court's officer.

22. But, with the receivership application outstanding since the beginning of May, Lion Force filed a Notice of Intent to Make a Proposal on the 13th. On the same day it issued a Notice of Application to convert the NOI into a *CCAA* proceeding.

23. The delivery of an NOI automatically stays creditor enforcement except for those whose rights crystallized after delivering appropriate notices before the NOI was filed. So Royal Bank is not subject to that stay.

24. It is telling that counsel from Ryal Bank did not know about the NOI until it received the *CCAA* material from Lion Force yesterday afternoon and evening.

25. I understand debtors who choose to have adversarial relationships with their creditors. It is one negotiating strategy. Where, however, a creditor needs a good relationship with its creditors in order to keep their confidence to support a management-led restructuring process, an adversarial relationship can be counter-productive as will be seen below.

26. Lion Force today asks for a very brief stay of proceedings, for just 10 days, to allow it to show that it has a viable chance to restructure its business. It lost its financial advisor due to conflict of interest about a week ago. Lion Force proposes its new advisor TDB Restructuring Limited as its Monitor under the *CCAA*.

5

27. TDB has only been retained for a week. Despite hard work, it has not had time to really get up to speed on the ins and outs of the business. Its draft report parrots the evidence of Lion Force in the main.

28. Lion Force and TDB propose to restructure the business by selling the head office, cutting the number of trucks on the road, increasing truck utilization from 86% to over 90%, and cutting costs.

29. Lion Force submits that its problems stem largely from its errant purchase of its head office. It had hoped to lease out a big piece of the property to help defray costs. It has been unable to do so. It blames the bank for refusing to agree. Now, it says, it can obtain tenants and then offer the land for sale with a leaseback option for Lion Force to remain in place. Alternatively, it can move if the buyer wants possession.

30. Lion Force submits that its ability to offer leaseback optionality to buyers makes a sale by it preferable to a sale by a receiver. This is its strongest point in my view.

31. Lion Force also submits that the sale of the land by a receiver will be a fire sale. I know of no empirical support for the idea that a sale of land for many tens of millions of dollars yields less proceeds when conducted by a receiver than by management. Both will use one of a short list of eminently qualified real estate brokers who practice at the high end. Moreover, a receiver has substantially more experience with conducting such sales than management of the trucking enterprise.

32. Lion Force says it hopes to reduce payables and increase receivables over the period of a stay. That is a valid  goal. It is supported by the cashflow forecast prepared by management and the proposed monitor. The cashflow forecast shows the company's fortunes improving by about week 15.

33. But this is where the issues with the bank play a part. The bank has lost faith in management.

6

34. Ignoring some courtroom hyperbole, the bank's witness, Mr. Derbedrossian, swore:

> 23. The Borrowers have been in default of their obligations to RBC under the Credit Agreements since September of 2024. The monetary defaults include, among other things: (i) the overdraft on Lion Force's operating line; (ii) the prior accumulation of lease payment defaults by both of the Borrowers; (iii) the accumulation of priority payable obligations, including, without limitation, significant property tax arrears in respect of the Real Property; (iv) the accumulation of 269's term loan payment defaults; and (v) the failure to pay Fuller's invoices as financial advisor to RBC per the Original Forbearance Agreement requirements. The Borrowers have also failed to comply with their various reporting requirements under the Credit Agreements and have failed to maintain the required financial covenant ratios, including the ratio of Total Liabilities to Tangible Net Worth and the Fixed Charge Coverage (as each term is defined in the Credit Agreements, as applicable) (collectively, the "Existing Defaults"). As of the date of this Affidavit, the Existing Defaults have not been cured.

35. There is evidence that Lion Force and its prior advisor gave moving estimates of payables from $600,000 to as much as $4 million. The never responded when asked to reconcile the differences. Then there is the late discovery of property tax arrears, WSIB garnishment, lack of insurance etc.

36. Moreover, the cashflow forecasts themselves reflect some hurry. They call for a $2 million DIP advance this week. That would be fresh money going in above the bank's security. But then in submissions, Mr. Ward says that his clients sharpened their pencils and would only need $600,000 - $700,000 in the first ten days.

37. The cashflows also assume the debtors will obtain $50,000 a month in rent from a sub-tenant raising to $100,000 in two months.  That is aspirational as Lion Force

7

has not been able to rent out the space to date. Ryal Bank says that if it is going to exercise a power of sale (or ask a receiver to sell) then it is contrary to the creditors' interests to instal sub-tenants who will have to be assumed or paid out to give vacant possession to a buyer.

38.  Mr. Derbedrossian lists specific concerns with the failure of Lion Force and its advisors to make monthly financial disclosures in terms specifically agreed upon in the forbearance agreements. While Lion Force's principals injected some capital, they did not inject the amount they agreed upon. Lion Force has had this material for two weeks and does not deny these facts.

39.  With the bank now learning that Lion Force is in arrears on payroll for drivers and for carriers, and lost its insurance at least for a time, I accept the reasonableness of Mr. Derbedrossian's evidence:

> 41. At this stage, RBC has lost faith in the Debtors' management, has not been provided with a binding refinancing commitment letter or an agreement of purchase and sale for the Real Property and therefore considers the only reasonable and prudent path forward is to take any and all steps necessary to protect the Property by having a receiver appointed, and it is within RBC's rights under the Security to do so.

40.  Lion Force also seeks approval of a DIP loan for $2 million (later expected to increase to $2.5 million) to prime all existing creditors. Yet it gave less than 24 hours' notice of this proceeding. I do not agree with Mr. Graff's submission that under s. 11.2 (1) of the *CCAA* the court lacks jurisdiction to give any priming effect to charges sought on short notice to secured creditors. On the other hand, when a debtor seeks a charge that will likely be paid for from the recovery of specific creditors, short-serving them is a symptom of the poor relationship that supports the creditor's lack of confidence in management.

41.  Another possible strategy was to be transparent with the bank and seek its support for a restructuring. Senior creditors have been known to advance DIP loans to

8

protect their own positions for example. The bank supported the debtors with forbearance for more than a year.

42. Lion Force has sought protection for an affiliate that apparently provides brokerage services for it. Despite lengthy engagement, Mr. Graff submits that he was unaware of the existence of this affiliate and fairly wonders about non-arm's length payments between them.

43. Lion Force also wants to use its DIP borrowing to make payment to carriers on pre-*CCAA* arrears. The statute allows for a charge for critical suppliers who are compelled to continue to supply during proceedings. It is not uncommon to go further and actually pay them on the basis that they are so important to the business, or they can so harm the business despite a stay, that virtually all agree that they should be paid to support the restructuring effort.

44. Here however, Lion Force seeks *carte blanche* to pay anyone pre-CCAA claims if the Monitor agrees. They do not identify who they propose to pay or put a cap on the quantum to be paid. They do not identify whom they propose to cut in the right-sizing efforts. Why pay them? How is the Monitor, who has been on the stage for a week, to know enough about individual creditors' roles to make an independent assessment apart from just trusting management?

45. Paying carrier arrears may again be an elevation of their priority and effectively paid for by Royal Bank. Surely Lion Force could have brought the bank in on its plans and sought a *modus vivendi*. Instead, it chose to short-serve the bank and ask for $600,00 - $700,000 (still shown as a $2 million in the draft order and cashflows) to erode the bank's position.

46. As I said at the outset, taking an antagonistic position with one's first secured creditor is a strategy. But it is not one that is going to engender trust or support when it is needed. What other undisclosed surprises await the creditors?

47. I agree with Mr. Ward that it is common for there to be an issue in CCAA cases where a stay and priming charges risk prejudicing senior creditors. The court has to balance the risk against the potential benefits of a restructuring.

9

48. There are some 30 jobs at risk in Canada. I do not know how many employees would be likely to obtain jobs with more stable competitors.

49. Lion Force puts forward the barest seedling of a plan. It does not reach a germ or a kernel. A sale of the land is required no matter which way this goes forward. The goal to right-size could have been implemented at any time in the last 20 months while Lion Force has been in default. There is scant mention in the material advanced by Lion Force of the fact that its revenues have declined due to tariffs and the competitive market. The aspiration for sub-letting and increased receivables has no underlying support. It is a hope. It is a long bomb thrown from deep in Lion Force's end-zone that needs to be caught and run in for a touchdown.

50. But Royal Bank is asked to bear the cost of an incompletion.

51. Royal Bank understands that receivables might dry up in a receivership if unpaid drivers try to get customers to pay them directly for delivery of their loads. Lion Force asks me to enjoin carriers from speaking to its customers and competing for their business during a restructuring. That stands in stark opposition to Mr. Ward's submission that the loyal customer base and loyal drivers and carriers are a value to the business that will be lost in a receivership. How loyal will unpaid suppliers of goods and services be?

52. On balance, in my view, the debtor has come to court too late. It is one thing to be contentious with your banker. But a trucking business that loses its insurance, owes arrears to its fuel supplier, has a regulator enforcing garnishment against it, runs up a half a million dollars in property tax arrears, and, especially, does not pay its employees and contractors, is too far gone. All of those people will have legitimate grievances that one cannot drop at the feet of Royal Bank and equipment lessors.

53. Mr. Ward asked me to pay particular attention to the decision of Kimmel J. in *JBT Transport Inc.(Re)*, 2025 ONSC 1436 (CanLII). In my view, the decision is quite similar to this one. Justice Kimmel discusses that where the major asset is real estate, receivership will predominate over *CCAA*. She discusses cases in which the

debtor has acted in a manner to ground an objective basis for a loss of confidence in management. She questions whether there is a germ of a plan or just delay of the inevitable liquidation. And she looks at the risk of erosion of secured creditors' position.

54. I agree that all of these concerns apply here. The land is the big ticket. The business in Ontario is a fraction of that value. The sale of the land is inevitable no matter who controls it. Lion Force has done little to engender support by the bank or equipment lessors for a restructuring. Rather, it proposes to prime them all with uncertain numbers and critical supplier payments with no disclosure or limits imposed.

55. The value of the possibility of selling the land with Lion Force in a leaseback is not quantified in evidence. Frankly, it affects Royal Bank almost exclusively.

56. Moreover, when a business stops paying insurance, realty tax, and its workers, and is not transparent with its ranking creditors, I cannot predict a long life to it leaseback or not.

57. The CCAA application is dismissed. The receivership order is granted as sought. If additional terms are needed to deal with TD Equipment Finance and Ten Leasing, I can be approached.

58. The proposed Monitor in the CCAA application provided confidential exhibits consisting of the LOI received by Lion Force and an appraisal of the land from mid-2025. It is in the public interest to ensure that the sale of land by the receiver is conducted fairly and with integrity. Allowing the release of these documents would risk skewing the process by artificially affecting the prices to be offered by potential bidders. The goal of a receivership sale process is to maximize realization using broad marketing to replicate fair market value. Violating the fairness and integrity of a sale process by releasing the documents to the public would be contrary to the public interest.

59. Sealing the confidential exhibits would be temporary (pending the completion of the sale process). There is minimal harm to the Open Court's principle by sealing

these documents. As can be seen from the discussion above, one does not need the bottom-line numbers set out in the confidential exhibits to understand fully the facts and applicable law before the court. Accordingly, the order dismissing the CCAA application is to contain an order sealing the confidential exhibits pending completion of a sale process in this receivership proceeding.

_____

FL Myers J.

Justice FL Myers

Digitally signed by
Justice FL Myers
Date: 2026.05.15
16:42:43 -04'00'

12